**Anthony ALLEN, Plaintiff,**

v.

**Simon LEIS, et al., Defendants.**

**No. C–1–00–261.**

United States District Court,
S.D. Ohio,
Western Division.

April 25, 2002.

Stephen R. Felson, Robert Brand Newman, Newman & Meeks Co., LPA, Cincinnati, OH, for plaintiff.

C. Joseph McCullough, White, Getgey & Meyer, Shannon M. Reynolds, Assistant Prosecutor, Hamilton County Prosecutor's Office, Civil Division, Cincinnati, OH, for defendants.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment (doc. 26); Defendants' Response (doc. 48); and Plaintiff's Reply (doc. 50). There are other pending motions in this case on which the Court will rule in a separate Order.

## BACKGROUND

On April 5, 2000, Plaintiff filed this Title 42 U.S.C. § 1983 action against Defendants (doc. 1). Plaintiff alleges that Defendants violated his constitutional right secured by the Fifth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, against the taking of personal property without due process of law. Plaintiff alleges this violation is the result of a policy, adopted pursuant to Ohio Revised Code § 341.06, which permits county sheriffs to seek reimbursement from prisoners related to the administrative costs of their confinement (doc. 40). On May 1, 2001, Defendants filed a Motion for Summary Judgment (doc. 18). On May 7, 2001 Plaintiff filed a Memorandum in Opposition to Defendants' Motion for Summary Judgment (doc. 19). On June 14, 2001 the Court issued an Order denying Defendants' Motion for Summary Judgment. Plaintiff filed a Motion for Partial Summary Judgment on July 24, 2001 (doc. 26). On January 10, 2002 Defendants filed a Memorandum Contra Plaintiff's Motion for Partial Summary Judgment (doc. 48). On January 23, 2002, Plaintiff filed a Reply (doc. 50).

On November 20, 2001, the Court issued an Order granting Plaintiff's Motion to Certify a Class, defining the class as all pre-trial detainees whose funds were confiscated before conviction under the Hamilton County Pay–For–Stay Program (doc. 43).

The following facts are generally undisputed by the Parties and are derived from Plaintiff's Complaint (doc. 1), Defendants' Motion for Summary Judgment (doc. 18), Plaintiff's Response (doc. 19), the Court's Order of June 14, 2001 (doc. 23), Plaintiff's Motion for Partial Summary Judgment (doc. 26), Defendants' Memorandum Contra Plaintiff's Motion for Partial Summary Judgment (doc. 48) and Plaintiff's Reply (doc. 50).

In 1996, the Ohio Legislature enacted Revised Code § 341.06, titled "Prisoner reimbursement policy; fees for medical treatment or services," which, in general, allows Ohio political subdivisions to seek reimbursement from prisoners for administrative costs and services (doc. 23).

On December 3, 1998, the Board of Hamilton County Commissioners and the Hamilton County Sheriff entered into an agreement and adopted a Prisoner Reimbursement Policy (also referred to as a Pay–For–Stay Program) as set forth in Ohio Revised Code § 341.06 (doc. 18). The Prisoner Reimbursement Policy requires any person confined in the Hamilton County Justice Center (hereinafter, "HCJC") to reimburse Hamilton County for expenses incurred by reason of that person's confinement. The expenses include a thirty-dollar ($30.00) book-in-fee in order to allegedly help defray a portion of the booking cost. The book-in-fee is the focus of Plaintiff's Complaint.

The Hamilton County Prisoner Reimbursement Policy was implemented soon after the Board of Commissioners and the Sheriff agreed to its adoption (doc. 18). Upon arrival at the HCJC, the prisoner is immediately taken to a booking window for initial processing. A processing clerk receives paperwork from the arresting officer and corrections officer related to the prisoner and sets a preliminary bond. The processing clerk then gives the corrections

officer a Release of Funds Waiver. At that point, the corrections officer explains the Prisoner Reimbursement Policy and asks the prisoner to read the Waiver. If the prisoner is illiterate, the corrections officer reads the Waiver to the prisoner. The corrections officer explains that a state law allows the Sheriff to require prisoners to reimburse the county for expenses associated with the costs of confinement. The prisoner is also informed that he or she can apply for a full refund of the book-in-fee if the criminal charges are dismissed or if the prisoner is acquitted of the charges. To apply for a refund, a prisoner is advised to bring proper documentation to the property window at the jail. A prisoner can also receive a refund by calling the Sheriff's Office during normal business hours using the telephone number listed on the Release of Funds Waiver. Defendants allege that a corrections officer then attempts to answer any questions that a prisoner might have regarding the Reimbursement Policy and asks the prisoner to sign the Release of Funds Waiver. A copy of the Release of Funds Waiver is then provided to the prisoner at intake (doc. 8). The monies collected from the book-in-fees are set aside in a separate account to the credit of the Hamilton County Sheriff's Office (Id.). It is undisputed that prisoners are advised that his or her refusal to sign the Waiver has no effect; the book-in-fee is taken from the prisoner with or without his signature on a Waiver (Id.).

Next, the prisoner's personal property is placed on the processing counter and inventoried. The processing clerk logs the property as it comes across the counter and places it in a plastic bag. A receipt is generated and explained to the prisoner. The prisoner is requested to confirm the accuracy of the receipt and sign it as well. The prisoner's cash-on-hand is separately inventoried on a "money form" receipt. The money form reflects the amount of cash inventoried, minus the book-in-fee, and is given to the prisoner to confirm its accuracy. Once again, the prisoner is asked to sign the form. The receipts are placed in the prisoner's personal property bag. The prisoner's cash that is applied to the book-in-fee is kept in a separate envelope from the prisoner's remaining cash. The remaining cash is deposited with the county treasurer and applied to the prisoner's inmate account. The book-in-fee is deposited with the county treasurer and applied as reimbursement for the cost of the prisoner's confinement.

At the conclusion of the prisoner's confinement in the jail, all personal property is returned to the prisoner with their corresponding receipts. As stated above, if the criminal charges are dismissed or the prisoner is acquitted of the charges, then he or she may apply for a refund of their book-in-fee. The refund can be requested in-person or by telephone. A great majority of refunds are requested by telephone. The disposition of the criminal case is checked by jail employees and if it meets the required criteria (dismissal or acquittal), a refund check is issued from the county.

In 1999, the Sheriff's Office collected a total of Pay–For–Stay funds in the amount of $468,335.76 (doc. 8). The majority of this consisted of the above-described book-in-fees (Id.). The fund was contributed to by 50,134 inmates for an average of $9.35. There were 3,589 inmates who refused to sign the Release of Funds (Id.). There were 452 refunds in 1999, 58 of which were less than $1.00 (Id.). The dollar amount of the refunds for 1999 appears to be $10,348.82, along with $1,903.95 that was eligible for a refund but for some reason was not refunded—for example, where the inmate's address was no longer valid (Id.). More than $2,300 was collected from detainees through June 6, 2000 because

book-in-fees were not fully paid on prior arrests and incarcerations (*Id.*).

On July 18, 1999, Plaintiff Anthony Allen was arrested by a Cincinnati police officer, on an outstanding felony forgery warrant and transported to the Hamilton County Justice Center (docs. 1, 19). Prior to that, Plaintiff had never been arrested. Plaintiff was taken to the intake area where he was processed. Plaintiff's personal property, including $100.00 in cash, was inventoried by a processing clerk and corrections officer. The processing clerk separated thirty dollars pursuant to the Prisoner Reimbursement Program. Plaintiff does acknowledge that he signed the Release of Funds Waiver and further identified his signature on the Waiver. Plaintiff also admits that, at the time of processing, he did not object to the book-in-fee to any of the deputies, either verbally or in writing, at any time during his confinement in the jail. Apparently, the first time Plaintiff voiced a complaint regarding the thirty dollar book-in-fee was immediately after he was released from the HCJC and was outside the building with his family.

The day after Plaintiff was released from the HCJC, he was advised by a Cincinnati police officer that the criminal charges filed against him would be dismissed. Apparently, while the police computer contained an entry with Plaintiff's name and social security number, Plaintiff in fact had no outstanding arrest warrant and was released after arraignment. At no time after the charges were dismissed did Plaintiff request or apply for a refund of the book-in-fee. It is undisputed by either Party that as of the day of the May 10, 2001 Hearing, Plaintiff had not sought a refund of his book-in-fee, which according to Defendants, he is still eligible to do.

## STANDARD OF REVIEW

The narrow question that this Court must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Id.* at 321, 106 S.Ct. 2548; *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir.1992); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Guarino*, 980 F.2d at 405.

As the Supreme Court stated in *Celotex*, the non-moving party must "designate" specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Guarino*, 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, " 'the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.' " *Guarino*, 980 F.2d at 405 (quoting *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.

1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir.1990). Furthermore, the fact that the non-moving party fails to respond does not lessen the burden on the moving party or the court to demonstrate that summary judgment is appropriate. *Guarino,* 980 F.2d at 410; *Carver v. Bunch,* 946 F.2d 451, 454–55 (6th Cir. 1991).

## ANALYSIS

Plaintiff argues in his Motion for Partial Summary Judgment that this action under 42 U.S.C. § 1983 requires Plaintiff to demonstrate that he was "deprived of a right secured by the federal Constitution or laws of the United States; the deprivation was caused by a person acting under color of state law; and the deprivation occurred without the due process of law" (doc. 26) (*citing O'Brien v. City of Grand Rapids,* 23 F.3d 990, 995 (6th Cir.1994)). According to Plaintiff, since all Defendants are Hamilton County officials, state action is not an issue here, and the facts demonstrate that Plaintiff's currency was taken without notice or hearing, or any other adjudication, pre- or post-deprivation (*Id.*). Plaintiff concludes, therefore, that if he is correct in his constitutional arguments, he is entitled to summary judgment on the liability issue (*Id.*) (*citing Johnson v. University of Cincinnati,* 215 F.3d 561, 572 (6th Cir.2000)).

Plaintiff further asserts a pretrial detainee, not having been convicted of any crime, may not be punished by the state (*Id.*). Plaintiff points to the Court's Order issued June 14, 2001 which states:

> Unless the county Defendants can prove that those funds [which were confiscated] are evidence of a crime, or the fruits of a crime, or that [there] are extraordinary or exigent circumstances which exist, the pre-trial detainees are entitled to notice and a hearing before seizure.

According to Plaintiff, since the County concedes that no pretrial detainee ever receives a hearing before the seizure of his or her funds, there is no need for further inquiry and Plaintiff is entitled to summary judgment on the merits of his claims, since there is no material fact in dispute. Consequently, according to Plaintiff, he is entitled to judgment as a matter of law (*Id.*) (*citing* Fed.R.Civ.P. 56).

Plaintiff next argues he is entitled to summary judgment because Defendants' conduct violates the Equal Protection Clause. Plaintiff points to the rationale set forth by the Court in its Order issued June 14, 2001 in support of that argument.

Plaintiff also argues that both Plaintiff and class have standing since the County has returned virtually none of the wrongfully attached book-in fees. Plaintiff distinguishes this case from *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), cited by Defendants as standing for the proposition that those plaintiffs were barred from injunctive relief against the conduct of certain Los Angeles police officers (*Id.*). According to Plaintiff, the Supreme Court in *Lyons,* concluded that the plaintiff "would have to credibly allege that he faced a realistic threat from future application of the City's policy" to administer choke holds to arrestees (*Id.*) (*citing Lyons* 461 U.S. at 106, 103 S.Ct. 1660).

Plaintiff argues that the instant situation is entirely different (*Id.*). He supports

this argument by asserting that the County is now holding, and was holding at the time the Complaint was filed, hundreds of thousands of dollars seized from pretrial detainees, both those who were convicted and those who were not (*Id.*). According to Plaintiff, each of the seizures violated the Constitution and the most direct remedy for these violations is to require the County to give the money back in all cases (*Id.*). Plaintiff asserts that the County has done so with respect to less than three percent of the funds wrongfully seized (*Id.*).

Plaintiff further asserts that any member of the class who is out on bail may be required to return to a county jail and if so, he or she will have to decide whether to bring money into the jail for personal needs (*Id.*). According to Plaintiff, in instances where the amount already attached was less than thirty dollars, a large majority of the cases, money brought in upon return to jail would be confiscated for the book-in fee up to a maximum total of thirty dollars (*Id.*). Plaintiff concludes from this that each such person would have standing to request an injunction on the authority of *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991).

Plaintiff cites *Riverside* as stating:

At the time the second amended complaint was filed, plaintiffs...had been arrested without warrants and were being held in custody without having received a probable cause determination, prompt or otherwise...Plainly, plaintiffs' injury was at that moment capable of being redressed through injunctive relief...This case is easily distinguished from *Lyons,* in which the constitutionally objectionable practice ceased altogether before the plaintiff filed his complaint.

It is true, of course, that the claims of the named plaintiffs have since been rendered moot; eventually, they either received probable cause determinations or were released. Our cases leave no doubt, however, that by obtaining class certification, plaintiffs preserved the merits of the controversy for our review. In factually similar cases we have held that the "termination of a class representative's claim does not moot the claims of the unnamed members of the class."

500 U.S. at 51–52, 111 S.Ct. at 1667 (citations omitted). Plaintiff concludes that no matter how this case is viewed on the merits, it cannot be dismissed on standing grounds (*Id.*).

Plaintiff also takes issue with Defendants' argument that, pursuant to the Prison Litigation Reform Act (hereinafter, "PLRA"), 42 U.S.C. § 1997e, the Court lacks jurisdiction in this case (*Id.*). According to Plaintiff, Defendants waived this exhaustion defense by not including it in their Answer (*Id.*). Plaintiff further asserts that the PLRA plainly applies to prisoners only (*Id.*) (*citing* 42 U.S.C. § 1997e(a)). Plaintiff asserts that since he is not now incarcerated and was not incarcerated at the time of the filing of the Complaint, the Act is plainly inapplicable to him and to all other class members similarly situated (*Id.*). Plaintiff concludes, therefore, that Defendants' jurisdiction argument is without force (*Id.*).

Finally, Plaintiff argues that the Ohio Legislature has granted all prisoners the right to a hearing in front of a judge before that person is required to reimburse the incarcerating authority for any costs of confinement (*Id.*). According to Plaintiff, Defendants have consistently argued that its confiscation and attachment policy is authorized by Ohio Revised Code (hereinafter, "O.R.C.") § 341.06 (*Id.*). Plaintiff asserts that this provision neither requires nor authorizes Defendants to

seize and attach an amount equal to the book-in fee, or any other cost of incarceration, prior to notice and hearing (*Id.*). Plaintiff further asserts that Defendants' position ignores the mandate of the Ohio Legislature set forth in two other statutory provisions, one for felonies and one for misdemeanors, each of which expressly requires a hearing before any order of reimbursement is made (*Id.*).

Plaintiff argues that O.R.C. § 2929.223(A) and (B) and O.R.C. § 2929.18(A)(4)(b)(i), while not in conflict with O.R.C. § 341.06 insofar as they relate to Defendants' right to be ultimately reimbursed, give anyone convicted of a felony or misdemeanor the right to a hearing in front of a judge before his or her money is seized (*Id.*). Plaintiff concedes that he is not a convicted offender, but points to the class which consists of "all persons whose funds were confiscated before conviction under the Hamilton County Pay–For–Stay Program" (*Id.*). Plaintiff further asserts that, at the time Defendants attached Plaintiff's thirty dollars, they believed that he might be convicted (*Id.*). Based on this, Plaintiff claims that he and every class member have a claim against the County treasury, having nothing to do with prospective equitable relief, for money wrongfully seized (*Id.*). Plaintiff concludes that it is beyond argument that state, county or local officials may not deprive a citizen of a property right created by state statute without due process of law, including notice and a hearing (*Id.*) (*citing Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538–39, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)).

Defendants argue that Plaintiff's Motion for Partial Summary Judgment must be denied because there are no claims for relief currently pending before the Court (doc. 48). According to Defendants, under the current procedural posture of this case, all of Plaintiff's requests for damages have been dismissed, and he has never made a request for injunctive relief (*Id.*). Defendants conclude that unless and until Plaintiff is permitted to amend his Complaint to include a viable request for damages, there are no pending claims before the Court (*Id.*).

Defendants further contend that, as a matter of law, Plaintiff is not entitled to judgment against Defendants for the compensatory and punitive damages sought in his Complaint (*Id.*). Defendants base this argument on the assertion that the Court dismissed Plaintiff's request for compensatory and punitive damages, and that dismissal also included Plaintiff's request for restitution because restitution is a form of compensatory damages (*Id.*). Defendants further assert that Plaintiff has not sought leave to reinstate his claims for compensatory damages, and as such, no such claim is currently before the Court (*Id.*). Therefore, according to Defendants, the Court's dismissal of the compensatory damage claim, when considered with the fact that Plaintiff has never sought injunctive relief, the Motion for Partial Summary Judgment must be denied, and this action dismissed (*Id.*).

Defendants also argue that, as a matter of law, Plaintiff is neither entitled to judgment against Defendants for the declaratory relief sought in his Complaint nor for injunctive relief (*Id.*). According to Defendants, Plaintiff did not seek injunctive relief in his Complaint and that in light of the experience and quality of Plaintiff's counsel, the only possible conclusion is that the omission was intentional (*Id.*). Defendants further assert that the Complaint was never amended to add a request for injunctive relief, and, as such, no request is before the Court (*Id.*).

Defendants do acquiesce that Plaintiff has prosecuted part of this action as if he had sought injunctive relief (*Id.*). Howev-

er, according to Defendants, Plaintiff has waived his right to seek that relief in his Motion for Partial Summary Judgment (*Id.*). Defendants conclude from this that Plaintiff's failure to plead injunctive relief in his Complaint, coupled with the dismissal of the request for compensatory damages, the Court is required to deny Plaintiff's Motion for Partial Summary Judgment and dismiss the action (*Id.*).

Defendants further argue that Plaintiff lacks standing to pursue this action because all claims for relief have either been waived or have been dismissed by this Court.

Defendants also contend that the Pay–For–Stay Program satisfies due process requirements (*Id.*). According to Defendants, in order to establish a 42 U.S.C. § 1983 claim against them, Plaintiff must prove that his constitutional rights were violated (*Id.*). Defendants assert that, in the case at bar, Plaintiff has not and cannot establish that he suffered a constitutional deprivation, an essential element of his case (*Id.*).

Defendants concede the due process clause of the United States Constitution requires a hearing to authorize any interference by the state with any property interest. However, according to Defendants, this does not mean that all such hearings must precede the interference (*Id.*). According to Defendants, the Supreme Court has expressly held that post-deprivation remedies can satisfy due process requirements (*Id.*). Defendants quote *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) as stating, "[i]n such cases, the normal predeprivation notice and opportunity to be heard is pretermitted if the state provides a postdeprivation remedy." According to the Defendants, the Supreme Court recognized that "the necessity of quick action by the State's action at some time after the initial taking, can satisfy the requirements of procedural due process" (*Id.*) (*citing Parratt*, 451 U.S. at 539, 101 S.Ct. 1908).

According to Defendants, in the present case, each pretrial detainee is afforded a post-deprivation remedy by a judicial tribunal at the time guilt or innocence of the crime with which the detainee is charged is determined (*Id.*). Specifically, Defendants assert that each detainee is afforded a hearing on the underlying charge for which he or she was initially brought to the HCJC (*Id.*). Defendants further argue that until the hearing on the underlying criminal charge has occurred, there is, and can be no final deprivation of property (*Id.*). Defendants support this argument by asserting that when an arrestee is brought to the HCJC, he or she is informed that a full refund of the book-in-fee can be applied for if the criminal charges are dismissed or if the detainee is acquitted (*Id.*). Defendants further assert that to apply for a refund, a detainee is advised to bring proper documentation to the property window at the jail (*Id.*). A detainee can also receive a refund by calling the Sheriff's Office during normal business hours (*Id.*). In other words, according to Defendants, there is no final deprivation of property until an individual is found guilty by a judicial tribunal of the criminal charges (*Id.*).

Defendants also argue that the Pay–For–Stay plan fits the fundamental requirement of due process in regard to the opportunity to be heard "at a meaningful time and in a meaningful manner" (*Id.*) (*citing Parratt*, 451 U.S. at 540, 101 S.Ct. 1908). According to Defendants, Plaintiff admits that the hearing on the underlying offense is held shortly after being charged (*Id.*). Defendants further argue that the Supreme Court has rejected the idea that "at a meaningful time and in a meaningful manner" always requires a State to provide a hearing prior to the initial depriva-

tion of property due to the impracticality of providing pre-deprivation hearings in some cases (*Id.*) (*citing Parratt,* 451 U.S. at 540, 101 S.Ct. 1908). Defendants conclude, therefore, there is no failure to provide due process in this case (*Id.*).

Defendants further point to the Supreme Court case *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) as setting forth a three-part test for determining what process is due when a government seeks to effect a deprivation of property (*Id.*). According to Defendants, the Supreme Court has stated that prior decisions indicate

> that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

(*Id.*) (*citing Mathews* 424 U.S. at 334, 96 S.Ct. 893). According to Defendants, the thinking in *Mathews* is economic: the weighing of benefits of added procedure against its costs. Defendants also argue that *Mathews* leans in favor of a presumption of the adequacy of existing procedure and away from heightened judicial scrutiny (*Id.*) (*citing Gilbert v. Homar,* 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997)).

Defendants argue that, in applying *Mathews* first factor in the present case, while the Pay–For–Stay policy may affect the property interest of the detainee, the significance of the detainee's property interest affected by the operation of O.R.C. § 341.06 weighs against the detainee and in favor of the Defendants' due process analysis (*Id.*). Specifically, according to Defendants, they have a clear right to be reimbursed for numerous expenses in connection with the operation of a jail (*Id.*) (*citing* O.R.C. § 341.06). Defendants further assert that States' rights to recoup their costs are well established (*Id.*). In other words, according to Defendants, they also have a property interest of their own in cash collected when detainees are processed into the system (*Id.*). According to Defendants, these competing property interests are both conditional and mutually exclusive; at the moment either vests, the other terminates: if the detainee is found guilty, the cash goes to the County; if not it reverts to the detainee (*Id.*). Defendants assert that these are the conditions precedent for the ultimate vesting of the property interest (*Id.*).

Defendants further argue that they are protecting the public interest by seeing that reimbursable expenses are recouped as the General Assembly has provided in O.R.C. § 341.06 (*Id.*). Defendants assert that they must collect the processing expense upon a detainee's initial entry into the HCJC, due to the ease with which a detainee could frustrate Defendants' interest in that property (*Id.*). Defendants also assert that the detainee's property interests are not as significant as those in forfeiture, attachment and garnishment cases; nor is the effect on the detainee so devastating in the event of forfeiture, attachment or garnishment (*Id.*). Defendants assert that, if they are forced to "chase the reimbursable expenses after a finding of guilty, forfeiture, attachment and garnishment may all occur" (*Id.*). Defendants conclude from this that the significance of the detainees' property interest weighs against the first factor in *Mathews* and in favor of Defendants (*Id.*).

Defendants next argue that applying *Mathews'* second factor, there is little, if any, risk of erroneous deprivation (*Id.*). According to Defendants, each detainee is afforded a hearing on the underlying criminal charge upon which he or she was confined (*Id.*). Defendants further assert that until the hearing on the underlying criminal charge has occurred, there is no final deprivation of property (*Id.*). Defendants contend that if the detainee is found not guilty, or the charge against him is dismissed, a full refund can easily be obtained (*Id.*).

Defendants further contend that it is certain that any alternative procedural requirements placed upon them would entail severe fiscal and administrative burdens. Defendants support this argument by asserting that the Hamilton County Sheriff processes approximately 50,000 to 55,000 detainees per year in the HCJC and pre-deprivation hearing cannot be provided to each of these detainees by the Sheriff or Hamilton County (*Id.*). Defendants assert a number of reasons to support this argument. First, according to Defendants, the Sheriff has no choice in accepting an arrestee for admission and processing (*Id.*). Further, according to Defendants, the Sheriff cannot conduct a pre-deprivation hearing for each detainee without violating his or her Fifth Amendment right to remain silent (*Id.*). Defendants conclude from this that a pre-deprivation hearing in order to assess whether a detainee is guilty of the crime with which he or she has been charged, and therefore subject to the Pay–For–Stay Program, is impossible (*Id.*).

Defendants take issue with Plaintiff's contention that the Government is not inconvenienced in any way by waiting for a hearing, since the money would ordinarily be held custodially and thus available for seizure after proper notice and hearing (*Id.*). Defendants assert that severe fiscal and administrative burdens would result if they were required to provide additional or substitute procedural requirements in attempting to collect thirty dollars from each detainee after the disposition of the criminal charge (*Id.*). For example, according to Defendants, if a detainee is convicted of the underlying charge and is subsequently released from jail, and failed to reimburse the county for a portion of the costs of confines, the detainee, now "debtor," would be required to pay all costs associated with any civil collection action (*Id.*).

Defendants further aver that the state legislature, in enacting O.R.C. § 341.06, provided local governments with an avenue for recouping a small percentage of the costs of confinement from those actually responsible for the government's incurring those expenses: the convicted (*Id.*). According to Defendants, they implemented the Pay–For–Stay Program, which provides adequate post-deprivation due process because the alternative, providing a pre-deprivation procedure, would undercut the legislative intent of O.R.C. § 341.06. Defendants assert that to recoup thirty dollars after conviction, a county would be forced to utilize the prosecutor's office to initiate formal collection proceedings and the cost for filing and pursuing a formal collection action in court would greatly exceed the thirty dollar book-in-fee (*Id.*). Defendants conclude, therefore, the due process remedy provided by Defendants satisfies the *Mathews'* test, and therefore, satisfies due process requirements.

Defendants also take issue with Plaintiff's so-called "afterthought" claim that Defendants' policy violates the Equal Protection Clause making summary judgment for Plaintiff appropriate (*Id.*). According to Defendants, Plaintiff has failed to meet his burden showing the absence of a genuine issue of material fact as to the essential elements of an equal protection claim (*Id.*).

Defendants support this argument by pointing to the June 14, 2001 Order issued by the Court in which it stated:

> Therefore, we find that there are genuine issues of material fact and questions that this Court must receive answers to before we can make a final determination as to whether the Pay–For–Stay Program is unconstitutional, as applied in Hamilton County.

According to Defendants, in moving for summary judgment on the equal protection claim, Plaintiff had the burden of establishing that the answers to the Court's questions favored a finding of unconstitutionality (*Id.*). Instead, according to Defendants, Plaintiff made no argument in support of summary judgment and point to no set of facts that would have favored summary judgment. Defendants conclude from this that Plaintiff is not entitled to summary judgment (*Id.*).

Finally, Defendants argue that, although they had a right to seek reimbursement for confinement costs pursuant to other legal authority, it is not controverted that the Pay–For–Stay Program was promulgated solely upon the authority of O.R.C. § 341.06. Defendants therefore take issue with Plaintiff's argument that O.R.C. §§ 2929.18(A)(4)(b)(i) and 2929.223 are relevant to this action. According to Defendants, by their express language both these statutes are operative only in cases wherein prisoners are required to reimburse the costs of their confinement "pursuant to sections 307.93, 341.14, 341.19, 341.23, 753.02, 753.04, 753.16, 2301.56, or 2947.19 of the Revised Code..." Defendants conclude, therefore, that neither statute cites or otherwise involves O.R.C. § 341.06 and neither statute applies to the instant case.

In his Reply Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment, Plaintiff argues that Defendants' assertion that there are no claims for relief currently pending before the Court has already been rejected by the Court in its Order of November 20, 2001 (doc. 50). Plaintiff similarly takes issue with Defendants' due process, equal protection and statutory arguments, asserting that the Court also rejected these argument in its prior decisions (*Id.*).

### Constitutionality of the Prisoner Reimbursement Statute

■ Because the named Plaintiff was not a convicted prisoner at the time his property was seized, the Court will proceed with its analysis pursuant to the Fourth and Fourteenth Amendment of the United States Constitution. *Phelps v. Coy,* 286 F.3d 295 (6th Cir.2002). At the outset, the Court wishes to make clear its conclusion that O.R.C. § 341.06, as written, is constitutional. However, the Court rejects Defendants' argument that the Pay–For–Stay Program implemented by Hamilton County meets the requirements O.R.C. § 341.06 and is thus constitutional. A thoughtful reading of O.R.C. § 341.06 reveals the flaws in Defendants' arguments.

The relevant portion of the statute in question reads as follows:

> (A)(1) In lieu of requiring offenders to *reimburse* the county for expenses incurred by reason of the person's confinement under section 341.14 or 341.19 of the Revised Code, the board of county commissioners, in an agreement with the sheriff, may adopt a prisoner *reimbursement* policy for the jail pursuant to this section to be administered in the jail under the sheriff's direction. The sheriff may appoint a *reimbursement* coordinator to administer the jail's *reimbursement* policy.
>
> (2) A prisoner *reimbursement* policy adopted under this section is a policy that requires a person confined to the jail to *reimburse* the county for any

expenses it incurs by reason of the person's confinement in the jail, which expenses may include, but are not limited to, the following:

(a) A per diem fee for room and board of not more than sixty dollars per day or the actual per diem cost, whichever is less, for the entire period of time the person is confined to the jail ...

(c) *Reimbursement* for county property damaged by the person while confined to the jail.

Rates charged shall be on a sliding scale determined by the sheriff with the approval of the board of county commissioners based on the ability of the person confined to the jail to pay and on consideration of any legal obligation of the person to support a spouse, minor children, or other dependents and any moral obligation to support dependents to whom the person is providing or has in fact provided support.

The *reimbursement* coordinator or another person designated by the sheriff may investigate the financial status of the confined person and obtain information necessary to investigate that status, by means that may include contacting employers and reviewing income tax records. The coordinator may work with the confined person to create a repayment plan to be implemented upon the person's release. At the end of the person's incarceration, the person shall be presented with a billing statement signed by the sheriff.

(3) The *reimbursement* coordinator or another person designated by the sheriff may collect, or the sheriff may enter into a contract with one or more public agencies or private vendors to collect, any amounts remaining unpaid. Within twelve months after the date of the confined person's release, the prosecuting attorney may file a civil action to seek *reimbursement* from that person for any billing amount that remains unpaid.

The county shall not enforce any judgment obtained under this section by means of execution against the person's homestead....

(4) Any *reimbursement* received under division (A)(3) of this section shall be credited to the county's general fund to be used for general fund purposes....

Ohio Rev.Code § 341.06(A) (West 2001) (emphasis added).

Section 341.06 of the Ohio Revised Code contemplates that "*[a]t the end* of the person's incarceration, the person shall be presented with a billing statement signed by the sheriff" and that "[w]ithin twelve months *after* the date of the confined person's release, the prosecuting attorney may file a civil action to seek reimbursement from that person for any billing amount that remains unpaid." O.R.C. § 341.06(A)(2)(c), (A)(3) (emphasis added). Nothing in O.R.C. § 341.06 suggests that a county may collect money to pay for expenses before or during the time of incarceration. Given that, pursuant to the Pay–For–Stay Program, Hamilton County appropriates property immediately upon a detainee's arrival at the HCJC, it is clear that the Pay–For–Stay Program does not meet the requirements of O.R.C. § 341.06.

It is further clear from the repeated uses of the word "reimbursement" throughout the statute that the Ohio Legislature chose that word carefully and deliberately. According to *Blacks Law Dictionary* "to reimburse" means "[t]o pay back, to make restoration, to repay that expended" 1157 (5th ed.1979). It is undisputed that any funds exacted from detainees pursuant to the Pay–For–Stay Program is collected immediately upon the detainee's arrival at the HCJC. It is also undisputed that the detainee's "obligation" to pay for the cost of being booked-in cannot be finally determined until after that detainee's conviction. Because O.R.C.

§ 341.06 allows only for repayment of a detainee's obligation, Defendants cannot find support for a program that demands payment before that obligation has been established. The Court concludes therefore, that the Pay–For–Stay Program does not satisfy the requirements of O.R.C. § 341.06. Therefore, Defendants' reliance on O.R.C. § 341.06 to establish the constitutionality of the Pay–For–Stay program is misplaced.

## Plaintiff's Claim for Restitution

█ Plaintiff is correct in asserting that Defendants' have made numerous arguments that the Court has repeatedly rejected. For example, in its Order granting class certification, the Court clearly rejected Defendants' argument that Plaintiff waived all claims for relief. Moreover, despite making these repeated arguments, Defendants have offered no law to support its assertion that a dismissal of a claim for compensatory damages precludes an award for restitution. The only analysis Defendants offer in support of this argument is a definition of compensatory damages that happens to include restitution as an example. The Court assumes, although this is far from clear, that Defendants infer from this that compensatory damages and restitution cannot be distinguished and, as such, the dismissal of one kind of relief inevitably involves the dismissal of the other kind of relief.

Even a cursory examination of Sixth Circuit case law reveals the weakness in Defendants' arguments. The Court in *Helfrich v. PNC Bank, Kentucky, Inc.*, 267 F.3d 477, 481 (2001), makes a clear distinction between restitution and compensation stating

[t]he basic distinction between equitable restitution and compensation focuses on the genesis of the award sought by the plaintiff. A restitutionary award focuses on the defendant's wrongfully obtained gain while a compensatory award focuses on the plaintiff's loss at the defendant's hands. Restitution seeks to punish the wrongdoer by taking his ill-gotten gains, thus removing his incentive to perform the wrongful act again. Compensatory damages on the other hand focus on the plaintiff's losses and seek to recover in money the value of the harm done to him.

*Citing Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 944 (8th Cir.1999). The Sixth Circuit makes a clear distinction between compensatory damages and restitution and the Court finds it self-evident that Plaintiff is seeking restitution. Moreover, as noted the court in *Storer Cable Comm. v. Joe's Place Bar & Restaurant, et al.*, 819 F.Supp. 593, 597 (W.D.Ky.1993), "[w]here a plaintiff's actual loss is nominal yet a wrongful act unjustly enriches a tortfeasor, courts have historically allowed plaintiffs to waive compensatory damages and recover restitution." *Citing* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 94, at 673, 675 (5th ed.1984).

Despite Defendants' repeated arguments concerning Plaintiff's alleged waiver of relief, they have not offered the Court any reason to stray from the clear logic of the Sixth Circuit. Therefore, the Court once again rejects Defendants' arguments and concludes that Plaintiff is indeed still seeking relief in the form of restitution. For the same reasons, the Court rejects Defendants' argument that Plaintiff lacks standing. Thus the Court denies Defendants' request that this case be dismissed.

## Due Process

The Fourteenth Amendment guarantees that in all cases where an individual stands to be deprived of life, liberty or property by the government, he is entitled to due process of law. *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (citing

*Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)).

Referred to as procedural due process, the Supreme Court has generally held that this aspect of the Fourteenth Amendment requires the State to provide individuals with notice and an opportunity to be heard before the State effects a deprivation. *United States v. James Daniel Good Real Property,* 510 U.S. 43, 51, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993); *Parratt v. Taylor,* 451 U.S. 527, 543–44, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

■ As demonstrated by Plaintiff, the facts relevant to this issue are uncontroverted. Plaintiff's currency was taken without notice or hearing, or any other adjudication pre- or post-deprivation. Defendants admit that every pretrial detainee is forced to pay the book-in-fee with whatever amount of funds that detainee may have on his or her person, up to the thirty dollar limit. It does not matter what crime the detainee may or may not have committed. It does not matter that the funds in the possession of the detainee may not have been linked to the crime charged or were considered to be the fruits of that crime. It does not matter whether that detainee is actually innocent of his or her charges, first time arrested, or a multiple felon. Finally, it does not matter whether the detainee signs the Waiver releasing those funds. The Court finds this last fact especially significant. Despite the fact that they are asked to sign a Waiver, and many detainees do, detainees are informed that there is no choice in the matter. The money will be taken with or without a signature on the Waiver. Therefore, there is no significant distinction between the members of the class that have signed a Waiver and those who have not.

Defendants rely heavily on *Parratt,* 451 U.S. at 527, 101 S.Ct. 1908 to support its argument that the Hamilton County Pay–For–Stay Program does not violate due process. Again, Defendants have repeatedly presented similar arguments and the Court has repeatedly rejected these. Even a cursory examination reveals the weakness of that reliance. At issue in *Parratt* was the adequacy of the process afforded a prisoner where prison officials negligently lost hobby materials that had been mailed to the plaintiff. *Parratt,* 451 U.S. at 529, 101 S.Ct. 1908. As noted by Defendants, the Supreme Court found that a post-deprivation hearing adequately secured the plaintiff's due process rights. Simple logic demonstrates the wisdom of the Court's reasoning. As the Court stated, in the case of negligent deprivation, "the loss is not the result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place." *Id.* at 541, 101 S.Ct. 1908.

The crucial distinction between the facts of *Parratt* and those of the instant case are obvious. In the case at hand, government officials intentionally take money from citizens being processed into the HCJC. The *Parratt* Court made this distinction clear and significant when it stated, "[i]t seems to us that there is an important difference between a challenge to an established state procedure as lacking in due process and a property damage claim arising out of the misconduct of state officers." *Id.* at 542, 101 S.Ct. 1908. *Citing Bonner v. Coughlin,* 517 F.2d 1311 (7th Cir.1975).

Further, the cases cited by the *Parratt* Court as examples of actions for which due process requires a pre-deprivation hearing clearly counter Defendants' argument.

After citing these cases, the Supreme Court noted that, "[i]n all these cases, deprivations of property were authorized by an established state procedure and due process was held to require predeprivation notice and hearing in order to serve as a check on the possibility that a wrongful deprivation would occur." *Id.* at 538, 101 S.Ct. 1908. Therefore, the Court finds these arguments unpersuasive.

The Court further rejects Defendants' arguments that the Pay–For–Stay Program is constitutional under *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The Due Process Clause is very clear in that Plaintiff cannot be deprived of his property without a notice and right to be heard. While it is true that there are several stated exceptions to this express right, as a matter of law, none of those exceptions would apply here.

Defendants' argument that Plaintiff's right in the property he has in his possession when arrested and processed does not vest until after a determination of guilt or innocence stretches jurisprudential imagination and relies on no case law to support it. It is axiomatic that citizens who are not guilty of crimes may be subject to arrest pursuant to probable cause. Taking Defendants' argument to its logical extreme, no citizen subject to arrest, guilty or innocent, has a vested right in his or her property until guilt or innocence has been determined. The Court simply will not come to such and extreme conclusion.

Defendants' assertions that it would be impracticable, unrealistic, and considered to be an undue burden on the County to provide every pretrial detainee notice and a hearing before confiscating their funds for the book-in-fee likewise fail. The Court answers this defense by simply stating that, if the County Defendants are unwilling or unable to offer every pretrial detainee their due process rights before charging them with the thirty dollar book-

ing fee, then the County Defendants should wait until a conviction or a plea of guilty before assessing the book-in-fee.

The Court fully recognizes that there are exceptions to the normal right to have notice and a hearing before one is deprived of his or her property rights by a governmental entity. But these cases normally involve fungible property that may be the product of the illegal activity. In addition, such cases are usually set forth in examples in which extraordinary or exigent circumstances exist that require the government to immediately confiscate the "fruits of a crime" or the evidence of a crime immediately, or else lose it forever. *Board of Governors of Federal Reserve Sys. v. DLG Fin. Corp.,* 29 F.3d 993, 1001 (5th Cir.1994) (finding that the freezing of assets as provided in 12 U.S.C. § 1818(i)(4) is an extraordinary situation not requiring pre-deprivation notice and hearing). Therefore, the Court rejects Defendants' conclusion that the Pay–For–Stay Program satisfies the first *Mathews'* factor.

The Court similarly rejects Defendants' analysis of the second *Mathews'* factor. Defendants' conclusion, that there is little risk of erroneous deprivation because a criminal trial affords prisoners a hearing on the underlying criminal charge, rests on the faulty notion that until that hearing is over, there is no final deprivation of property. The Court concludes that the deprivation of property occurs at the moment the book-in-fee is separated from the remainder of a prisoner's property. It is clear from the facts that there is no hearing before this deprivation occurs. Therefore, the risk of erroneous deprivation is extreme. Thus, the Pay–For–Stay Program fails to satisfy the second *Mathews'* factor.

Finally, the Court rejects Defendants' argument that due process is satisfied because any alternative procedure re-

quirements placed upon Defendants would entail severe fiscal and administrative burdens. The Court rejects Defendants' argument that such burdens would result if they were only allowed to collect the Pay–For–Stay fee after a criminal trial has been held. Many convictions result in court costs and fines charged to a defendant. Presumably, these monies would be at least as difficult to collect as a thirty dollar Pay–For–Stay fee. Using Defendants' logic, the HCJC should collect money for possible fines and court costs as soon as a prisoner is processed. Again, the Court refuses to come to such an extreme conclusion.

The Court thus concludes that, as a matter of law, the Hamilton County Pay–For–Stay Program fails to afford prisoners due process and is therefore unconstitutional.

### Equal Protection

Because the Court has determined that the Pay–For–Stay Program is unconstitutional because it violates due process, it is unnecessary for the Court to analyze Plaintiff's equal protection claims. Nevertheless, in the interest of clarity, the Court will entertain these anyway.

Defendants are correct in quoting the Court's June 14, 2001 Order that stated, "[w]e find that there are genuine issues of material fact and questions that this Court must receive answers to before we can make a final determination as to whether the Pay–For–Stay Program is unconstitutional as applied in Hamilton County" (doc. 23). As its June 14, 2001 Order indicated, the Court strongly suspects that the Pay–For–Stay Program would be determined by a finder of fact to be a violation of equal protection. However, as the Court is deciding on a Motion for Summary Judgment and cannot look beyond the pleadings, the Court cannot find, at this time, as a matter of law, that the Pay–For–Stay Program violates Equal Protection.

### Relevance of O.R.C. §§ 2929.223 And 2929.18(A)(4)(b)(i)

Defendants argue that O.R.C. § 2929.18(A)(4)(b)(i) and O.R.C. § 2929.223 have no relevance to the action at hand because by their express terms, these two statutes are operative only in cases wherein prisoners are required to reimburse the costs of their confinement pursuant to sections 307.93, 341.14, 341.19, 341.23, 753.02, 753.04, 753.16, 2301.56, or 2947.19 of the Revised Code. Defendants assert that neither statute cites or otherwise involves O.R.C. § 341.06.

The Court rejects Defendants' analysis. O.R.C. § 341.06, which allows for a Pay–For–Stay Program, and is the statute upon which Defendants rely for authority to conduct the Hamilton County Pay–For–Stay Program, is clearly relevant to the case at hand. O.R.C. § 341.06 states that "[i]n lieu of requiring offenders to reimburse the county for expenses incurred by reason of the person's confinement under section 341.14 or 341.19 of the Revised Code" a county may require reimbursement by prisoners. The Court believes that it is logical to assume that if Section 2929 of the Ohio Revised Code applies to O.R.C. § 341.14 or O.R.C. § 341.19 that it would apply to sections like O.R.C. § 341.06 that allow for the collection of monies in lieu of O.R.C. § 341.14 or O.R.C. § 341.19.

The Court further agrees with Plaintiff that O.R.C. § 2929.18(A)(4)(b)(i) and O.R.C. § 2929.223 give anyone convicted of a felony or misdemeanor the right to a hearing in front of a judge before his or her money is seized. The Court also agrees with Plaintiff that this same right must also apply to pretrial detainees who are eventually discharged without being charged or who are acquitted at trial.

The Court therefore agrees with Plaintiff that the Hamilton County Pay–For–

Stay Program does not satisfy Ohio statute and that, Plaintiff is entitled to judgment as a matter of law regarding Defendants' liability.

**CONCLUSION**

The Court concludes that there are no genuine issues of material fact regarding Defendants' liability. Because Defendants have been unable to demonstrate a genuine issue of material fact regarding this issue, Plaintiff is entitled to judgment as a matter of law regarding the issue of liability in this case. Accordingly, the Court hereby GRANTS Plaintiff's Motion for Partial Summary Judgment in their favor on the questions of Defendants' liability to them, as aforesaid (doc. 26).

SO ORDERED.